UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GREGORY MARONEY, *et. al.*,

                              Plaintiffs,

         v.

WOODSTREAM CORPORATION,

                              Defendant.

No. 19-CV-8294 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Aleksandr J. Yarmolinets, Esq.
Timothy G. Blood, Esq.
Blood Hurst O'Reardon, LLP
San Diego, CA
*Counsel for Plaintiffs*

Andrew Obergfell, Esq.
Yitzchak Kopel, Esq.
Bursor & Fisher, P.A.
New York, NY
*Counsel for Plaintiffs*

Jay P. Lefkowitz, Esq.
Leonora Cohen, Esq.
Robyn E. Bladow, Esq.
Kirkland & Ellis LLP
New York, NY
Los Angeles, CA
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

Gregory Maroney ("Maroney") and Henry H. Heumann ("Heumann," together

"Plaintiffs") bring this Action for violations of N.Y. Gen. Bus. Law §§ 349 and 350 and the

Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.,* and for unjust enrichment, breach of

express warranty, and fraud against Woodstream Corporation ("Woodstream" or "Defendant"),
alleging that Defendant marketed and sold ultrasonic rodent repellers through false and deceptive
advertisements.  (*See generally* Second Am. Compl. ("SAC") (Dkt. No. 52).)  Before the Court
is Defendant's Motion To Dismiss the claims brought in the Second Amended Complaint (the
"Motion") pursuant to Federal Rule of Civil Procedure 12(b)(6).  (*See* Dec. in Support of Mot.
(Dkt. No. 54).)

For the reasons stated herein, the Motion is granted in part and denied in part.

## I.  Background

### A.  Allegations and Materials Appropriately Considered

As a threshold matter, the Court must determine whether it may consider the (1) 1994
Consent Order between Sonic Technology Products, Inc. ("Sonic"), a company acquired by
Woodstream that originally developed the PestChaser® Products at issue in the present
litigation, and the Federal Trade Commission ("FTC") (*see* Dkt. No. 56-1); and (2) the 1996 No
Further Action Letter from the FTC to Sonic (*see* Dkt. No. 56-2), both attached as exhibits to
Defendant's Motion To Dismiss, at this stage of the litigation.

#### 1.  Applicable Law

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the
pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would convert
the Rule 12(b)(6) motion to dismiss into one for summary judgment pursuant to [Rule] 56."
*Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002)
(citation omitted).  However, "the Court's consideration of documents attached to, or
incorporated by reference in the [c]omplaint, and matters of which judicial notice may be taken,
would not convert the motion to dismiss into one for summary judgment."  *Id*. (citations

omitted); *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety. . ., documents incorporated into the complaint by reference, and matters of which a court may take judicial notice") (quotation marks omitted); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.'" (alteration omitted) (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993))).  Under the Federal Rules of Evidence, a court may take judicial notice of a fact outside of the pleadings provided that the fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).

### 2.  Application

Defendant argues this Court should take judicial notice of the Consent Order and No Further Action Letter.  (*See* Notice of Request for Judicial Notice (Dkt. No. 57).)  Courts routinely take judicial notice of agency records, including consent orders, which are available to the public—accordingly, this Court may consider the attached Consent Order.  *See, e.g.*, *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 124 n.12 (2d Cir. 2010) ("[W]e are empowered to take judicial notice of the 2003 Consent Order, as it is a public record."); *Campanelli v. Flagstar Bancorp, Inc.*, No. 19-CV-7299, 2020 WL 5350245, at *7 (S.D.N.Y. Sept. 4, 2020) (noting that in ruling on a motion to dismiss, the court may "consider matters of which judicial notice may be taken" including "OCC and CFPB consent orders" which "qualify as such documents"); *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 294 (S.D.N.Y. 2019) ("The Court may take judicial notice of the CFTC Order, DOJ plea agreement[,] and similar

public documents such as consent orders."); *Riverkeeper, Inc. v. Mirant Lovett, LLC*, 675 F. Supp. 2d 337, 344 n.7 (S.D.N.Y. 2009) ("[T]he Court takes judicial notice of the 2004 Consent Order, as it is a matter of public record and acknowledged by both sides.").  "The Court may not, however, rely upon [consent orders] for the truth of the matters asserted without converting the motion into a motion for summary judgment." *Campanelli*, 2020 WL 5350245, at *7; *Riverkeeper, Inc.*, 675 F. Supp. 2d at 344 ("[T]he Court is considering the 2004 Consent Order not for the truth of the assertions therein, but only for the fact that these assertions were made."). However, as it is not clear to the Court that the No Further Action Letter is a public record and Defendant provides no other reason for the consideration of the letter, the Court does not consider it. *See Church & Dwight Co. Inc. v. SPD Swiss Precision Diagnostics, GmbH*, No. 14-CV-585, 2014 WL 2526965, at *7 (S.D.N.Y. June 3, 2014), *adhered to*, 104 F. Supp. 3d 348 (S.D.N.Y. 2015), *aff'd*, 836 F.3d 153 (2d Cir. 2016), *and aff'd*, 843 F.3d 48 (2d Cir. 2016) (holding the court could not consider "SPD's communications with the FDA" because they "are not public records of agency actions. Rather, the documents SPD submits in support of its request for judicial notice are internal documents that SPD held in confidence") (citing *United States v. Speakman*, 594 F.3d 1165, 1172 n. 4 (10th Cir. 2010) (refusing to take judicial notice of an arbitration award because the arbitration organization was not a public agency); *FDIC v. Loudermilk*, No. 12-CV-4156, 984 F. Supp. 2d 1354, 1357 (N.D. Ga. Nov. 22, 2013) (refusing to take judicial notice of favorable FDIC reports that were not public documents); *see also Fair v. Esserman*, No. 15-CV-681, 2015 WL 7451154, at *4 (D. Conn. Nov. 23, 2015) (holding that "FOIA requests are not a proper subject for judicial notice" because they are "not public records of agency actions").

B.  Factual Background

Victor PestChaser Rodent Repellers (the "Repellers") purport to repel rodents through "ultrasound" technology.  (SAC ¶¶ 1–2.)  The packaging states that "[r]odent activity can be reduced in 6 to 10 days," that the Repellers are for "use anywhere indoors," that the Repellers provide "Maximum Coverage," and that "each unit lasts 3 to 5 years[:]"



(*Id*. ¶ 2.)  The Repellers advertise they are "[f]or [u]se [i]n" "[a]verage-size rooms, including kitchens, dining rooms, bedrooms, bathrooms, basements and living rooms," and the "[u]sage [n]otes" state "clear all surrounding objects away from the device.  The ultrasound admitted by it does not travel through walls, furniture, cabinets or any other object."  (*Id*.)

Maroney, a New York citizen and resident, purchased a Victor three-pack Mini PestChaser Rodent Repeller with Nightlight from Walmart in Middletown, New York, in or about September 2018 for approximately $20.  (*Id*. ¶ 7.)  Prior to purchase, Maroney carefully

5

read the Repellers' labeling, including the representations that it was a "Rodent Repeller" that would repel rodents through "ultrasound" technology, that "[r]odent activity can be reduced in 6 to 10 days," that the Repellers are for "use anywhere indoors," and that "each unit lasts 3 to 5 years." (*Id*.) Maroney alleges that he relied on these representations and would not have purchased the Repellers at all, or would have only been willing to pay a substantially reduced price for the Repellers had he thought these representations were false or misleading. (*Id*.) "Maroney used the Repellers for several months but observed no reduction in rodent activity." (*Id*.) Maroney alleges that he did not learn that this lack of reduction in rodent activity was due to a defect in the product until August 2019. (*Id*.) Maroney sent a demand letter informing Defendant that its Repellers were ineffective and did not work as advertised on August 19, 2019, a copy of which is included in the collection of correspondences attached as Exhibit B to the Second Amended Complaint. (*Id*.)

Heumann is a citizen of the State of Florida, who maintains a vacation home in Herkimer County, New York. (*Id*. ¶ 8.) He purchased 59 Repellers, including the approximately $14.99 Classic Pestchaser and the $19.99 Victor three-pack Pestchaser Mini in New York State over a period of several years. (*Id*.) Heumann alleges he relied on Defendant's representations when purchasing the Repellers. (*Id*.) In October 2017, Heumann mailed 10 Repellers to Defendant with an letter claiming that the Repellers did not function as advertised, a copy of which is included in the collection of correspondences attached as Exhibit A to the Second Amended Complaint. (*Id*. ¶ 9.) Defendant informed Heumann that the Repellers he sent back functioned properly and recommended using the Repellers in conjunction with other means of rodent control. (*Id*.) Based on this assurance, Heumann purchased additional Repellers. (*Id*.) Months later, Heumann found his property damaged by rodents. (*Id*.) On May 9, 2018, Heumann

informed Defendant again by letter that the Repellers had not accomplished their advertised function of repelling rodents, specifically mice, and that mice had damaged his personal property, a copy of which is included in the collection of correspondence attached as Exhibit A to the Second Amended Complaint.  (*Id*.)  On May 29, 2018, after not receiving a response from Defendant, Heumann informed Defendant by letter that he had spoken with other users of Repellers, who reported that their Repellers also did not work as advertised and did not repel any rodents, a copy of which is included in the collection of correspondences attached as Exhibit A to the Second Amended Complaint.  (*Id*.)  On July 26, 2018, after Defendant had not responded to Heumann's May 2018 letters, Heumman wrote to Defendant again about the malfunction of the Repellers and claimed that mice had destroyed his property, a copy of which is included in the collection of correspondences attached as Exhibit A to the Second Amended Complaint. (*Id*.)

Defendant is a Pennsylvania corporation with its principal place of business in Lititz, Pennsylvania.  (*Id*. ¶ 10.)  Defendant manufactures, advertises, markets, distributes, and sells the Repellers throughout the United States.  (*Id*.)

Plaintiff states that "[m]ultiple videos accessible on the Internet show that Defendant's Repellers simply do not work," citing to a YouTube video.  (*Id*. ¶ 16.)  The video shows a "mouse feeding station"—a wooden box with a clear lid.  (*Id*.)  The box contained a small hole for rodents to enter and exit the box:



(*Id.*)  Sunflower seeds were added to the station, which was left in a barn.  (*Id.* ¶ 17.)  First, the station was tested without the Repeller for several nights.  (*Id.*)  Each night, rodents entered to eat the sunflower seeds:



(*Id*.)  Next, an operational Victor PestChaser Rodent Repeller was plugged into an extension cord and placed in the station under the lid for a night.  (*Id*. ¶ 18.)  The mice continued to enter the station:



(*Id*.)

Based on this, the experiment found:

> Last night we set up the test station in the barn with sunflower seeds and the rodent repeller, and as you can see, all the bait is gone.  Even though we placed seeds only a few inches away from the device, mice had no problem coming in, eating the food.  They didn't seem too bothered by the sound.  This claims to be 'rodent repeller,' but after seeing it in action, I don't think I can recommend this device.

(*Id*. ¶ 19.)

Plaintiffs allege that no peer-reviewed or credible test has found ultrasonic repellers, like the Repellers, to be effective in repelling and controlling rodents.  (*Id*. ¶ 20.)  After reviewing the data, one textbook summarized that: "[t]here are no indications that ultrasonic devices, as a single or long method, will control rodents, and regardless of the desire for a 'magic bullet,'

ultrasonic devices are useless for the control of insect pests." (*Id*. ¶ 21 (citing F.E. Wood,

*Nonpesticidal Components Essential to Pest Management*, in Advances in Urban Pest

Management 129–62 (G.W. Bennett and J.M. Owns eds. 1986)).)  An article concluded:

> It is well established that such (ultrasonic) devices will not exterminate, kill, or drive rodents out of a favorable habitat. At best, they may temporarily discourage rodents from visiting areas in buildings that have little cover available … most rats and other rodents quickly become accustomed to any new sound, especially after it has been repeated long enough.

(*Id*. ¶ 24 (citing W.E. Howard & R.E. Marsh. *Ultrasonics and Electromagnetic Control of*

*Rodents*, Acta Zool. Fennica 173:187–89 (1985).)  Another study finds that "[n]one of the units

produced anything more than a partial repellency for a day or so which was overcome, regardless

of whether the frequency was variable, random, or intermittent." (*Id*. (citing A.P. Meehan, *Rats*

*and Mice: Their Biology and Control,* 383 (1984)).)  Another study finds that:

> "In our experiments, ultrasonics did not repel rats and mice from any of the tested areas. . . . Eight years of evaluation of basic principles inherent to the use of acoustical frightening devices produced only negative results. None of the combinations tested will effectively extirpate rodents from a storage building by stimulating their receptors."

(*Id*. (citing W.L Sprock et al., *Sounds as a Deterrent to Rats and Mice*, J. of Wildlife Mgmt., 729

(1967).)  Similarly, another study concludes that "[d]espite the wide range of decibel levels and

frequencies evaluated, strong, sustained repellent effects were never detected . . . the six devices

had insufficient repellency to merit any usefulness in rodent pest control applications, preventive

or corrective." (*Id*. (citing S.A. Shumake, *Electronic Rodent Repellent Devices: A Review of*

*Efficacy Test Protocols and Regulatory Actions*, in Repellents in Wildlife Mgmt. 253-70

(1995)).)  Another study agrees that "[t]here have been so many failures reported with high-

frequency sound that little can be said in favor of such devices." (*Id*. (citing Ann E. Koehler et

al., *Frightening Methods and Devices/Stimuli to Prevent Mammal Damage – A Review*,

Proceedings of the 14th Vertebrate Pest Conf., 168 (1990)) [hereinafter *Frightening Methods and Devices/Stimuli to Prevent Mammal Damage – A Review*].)

While "[r]odents can hear ultrasound and very briefly may be briefly disturbed by the soundwaves. . . . they very quickly become habituated to ultrasound and disregard it within hours of activating a device." (*Id.* ¶ 23.)  A 2015 paper from the University of Arizona's College of Agriculture & Life Sciences concludes that "[c]ommercially available sonic pest devices for use in residential applications have not been shown to be effective in scientific studies." (*Id.* ¶ 25 (citing Nicholas Aflitto & Tom DeGomez, *Sonic Pest Repellents*, Univ. of Arizona – Cooperative Extension, College of Agriculture & Life Sciences (2015), https://extension.arizona.edu/sites/extension.arizona.edu/files/pubs/AZ1639-2015.pdf).) According to the researchers, the "track-record of sonic pest devices has been questionable" since the 1960's and 1970's. (*Id.*)  The researchers further explain that rodents' "dislike [of the ultrasonic sounds] diminished over time, especially after a reliable food source was discovered near the sonic device.  Even after the food source was removed the rats and mice continued to explore the room with ultrasonic sound, expressing habituation to the sound." (*Id.* (alteration in original).)

A study published by University of Nebraska also concludes that "frightening techniques," including use of ultrasonic devices, "rarely have any appreciable effects on small rodents." (*Id.* ¶ 26 (citing *Frightening Methods and Devices/Stimuli to Prevent Mammal Damage – A Review* at 171).)  Echoing similar findings from earlier studies, the authors again conclude that "rodents habituate to [ultrasonic noise] and will feed or nest alongside the operating devices." (*Id.* (alteration in original).)  The authors find that "[t]here have been so many failures reported with high-frequency sound that little can be said in favor of such

devices." (*Id*.) A 1998 study published by Utah State University also concludes that mice and rats "become accustomed to new sounds and thus tend to ignore them," rendering ultrasonic repellers ineffective. (*Id*. ¶ 27 (citing Ben C. West & Terry A. Messmer, *Commensal Rodents*, Utah State Univ. Extension (1998)).) Due to the rodents' adaptability to sound, the study reiterates, "scientific evidence clearly shows that these devices are not useful in repelling rats or mice." (*Id*.) In 2017, the Office for Science and Society at McGill University published an article summarizing decades of research into efficacy of ultrasonic soundwave emitting devices to control rodent infestations, concluding that "these devices have never been proven to actually work." (*Id*. ¶ 28 (citing Cassandra Lee, *Are Ultrasonic Pest Repellers Effective?*, McGill Univ. Off. of Sci. and Soc'y (2017), https://www.mcgill.ca/oss/article/technologyyou-asked/are-ultrasonic-pest-repellers-effective (last visited July 19, 2019)).)

Often called the "bible of pest control," the *Mallis Handbook of Pest Control* states: "Despite a history of 35 years of availability and use, the overwhelming majority of the professionals in the pest management industry on a global scale have failed to embrace ultrasonic devices, even as a supplement to conventional rodent control programs. Certainly, this reluctance cannot be written off as an oversight by on-the-job professionals." (*Id*. ¶ 22 (citing R.C. Corrigan, *Rats and Mice*, in Handbook of Pest Control 11-149 (S.A. Hedges ed., Franzak & Foster 10th ed., 2011)).)

Plaintiffs allege that even if ultrasonic devices work theoretically, these devices cannot work in real-world environments. (*Id*. ¶ 30.) Experts have pointed out that "[u]ltrasonic sound waves are highly directional, and are unable to penetrate or bend around solid objects such as cabinets, doors, furniture, appliances, walls, floors or ceilings. The waves are also rapidly absorbed by soft-textured materials such as cloth, paper, cardboard, and insulation.

Consequently, they cannot reach cracks, crevices, voids, corners, and other protected places where most pests live." (*Id*. ¶ 31 (citation omitted).)  Michael F. Potter, a professor of entomology at the University of Kentucky, has explained regarding ultrasonic devices, "[i]f . . . rodents did happen to avoid the device, control of infestations still would be unlikely since they would simply relocate elsewhere in the building.  Using repellents indoors often make pest problems worse since the displaced individuals often repopulate in harder to reach locations (behind and between walls, floors, and ceilings; deep within clutter and storage; hidden voids of cabinets, appliances and furniture; etc.)." (*Id*. ¶ 4 (citation omitted).)

In May 2001, the FTC sent warning letters to over sixty manufacturers and retailers of ultrasonic pest-control devices.  (*Id*. ¶ 33.)  After investigation, the FTC found that many of the advertisements made explicit false claims about the products' ability to eliminate rodents or repel insects.  (*Id*.)  According to FTC staff, these types of claims may not comply with the FTC Act, which prohibits false and deceptive advertising.  (*Id*.)  From 1985 to 1997, the FTC brought actions against six companies that made false claims about the effectiveness of ultrasonic devices in controlling rodent and insect infestations, including representations that ultrasonic devices can eliminate rodent infestations, repel insects, and serve as an effective alternative to conventional pest-control products.  (*Id*. ¶¶ 34–35.)

Plaintiffs allege that "[t]he false and misleading representations and omissions were made with knowledge of their falsehood," because "Defendant is a top distributor of pest repellant products in the United States that is undoubtedly aware of the studies finding that its product does not work and of the FTC investigation referenced above.  Nonetheless, Defendant continues to sell its ineffective and worthless Repellers to unsuspecting consumers."  (*Id*. ¶ 74.)

Plaintiffs seek to represent a class defined as all persons in the United States who purchased the Repellers (the "Class"). (*Id*. ¶ 37.)  Excluded from the Class are persons who made such purchase for purpose of resale. (*Id*.)  Plaintiffs also seek to represent a subclass defined as all Class members who purchased the Repellers in New York (the "New York Subclass"). (*Id*. ¶ 38.)

C.  Procedural History

Plaintiffs filed their original Complaint on September 5, 2019, (Dkt. No. 1), their Amended Complaint on October 11, 2019, (Dkt. No. 11), and their Second Amended Complaint on October 25, 2022, (Dkt. No. 52).  Defendant filed its Motions To Dismiss and accompanying Memorandum of Law on December 9, 2022. (*See* Not. of Mot. (Dkt. No. 54); Mem. of Law in Supp. of Mot. ("Def.'s Mem.") (Dkt. No. 55).)  Plaintiffs filed their Opposition on January 9, 2023. (*See* Mem. of Law for Reply to Mot. to Dismiss ("Pls.' Mem.") (Dkt. No. 58).)  Defendant filed its Reply on February 8, 2023. (*See* Reply to Mot. ("Defs.' Reply Mem.") (Dkt. No. 59).)

II.  Discussion

A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a Rule 12(b)(6) motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it

tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79. ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegation contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw all reasonable inferences in the plaintiff's favor," *Division 1181*, 9 F.4th at 95 (citation omitted). Additionally, "when ruling on a Rule 12(b)(6) motion to dismiss," district courts are directed to confine their consideration to "the complaint in its entirety, . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (quotation marks omitted); *see also Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 240 (S.D.N.Y. 2021) (same).

15

Finally, fraud claims—including common law fraud claims—are subject to the heightened pleading standard set forth in Rule 9(b).  *See Matana v. Merkin*, 957 F. Supp. 2d 473, 484 (S.D.N.Y. 2013) ("[A] claim for common law fraud under New York law must satisfy the requirements of the heightened pleading standard under Federal Rule of Civil Procedure 9(b)." (collecting cases)).  Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  However, courts "must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations," rather "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52, (2d Cir. 1995)).  "An inference is 'strong' if it is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Pilkington N. Am. Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 460 F. Supp. 3d 481, 492 (S.D.N.Y. 2020) (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 176–77 (2d Cir. 2015)). As explained by the Second Circuit, Rule 9(b) requires a Plaintiff to "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Loreley*, 797 F.3d at 171.

B.  Analysis

1.  Repellers' Representations

Defendant argues that "Plaintiffs' claims all suffer from the same fundamental defect: they do not state plausible factual allegations that PestChaser® products failed to perform as

represented or warranted—allegations which are required for each of Plaintiffs' claims to survive." (Def.'s Mem. 5–6 (citing *Fink v. Time Warner Cable,* 714 F.3d 739, 742 (2d Cir. 2013) (finding plaintiffs' claims of GBL § 349, fraud, and unjust enrichment facially implausible because "the allegations of the Complaint are materially inconsistent with the sole advertisement Plaintiffs have submitted"); *Brady v. Basic Rsch., L.L.C.*, 101 F. Supp. 3d 217, 236 (E.D.N.Y. 2015) (providing that New York breach of express warranty and MMWA claims stand or fall together and require a showing that the products do not conform to representations made; dismissing GBL claim because the plaintiff failed to establish that the product packaging contained any material misrepresentations; dismissing fraud claim because fraud requires a false misrepresentation of material fact)).) [1]

Defendant argues that the scientific evidence cited in Plaintiffs' complaint is irrelevant because the "cited articles or studies [do not] even mention[]—let alone test[]—PestChaser®

---

[1] Defendant additionally argues that neither Plaintiff has alleged facts supporting the allegation that they used a product and found that after 6 to 10 days, rodent activity was not reduced. (Def.'s Mem. 6–7.) For instance, Defendant argues that Maroney did not "plead the amount of rodent activity he observed either before or after using the product." (*Id*. at 6.) Defendant argues that Maroney's allegations "would be consistent with a customer who observed no rodent activity to begin with, or who purchased the Products prophylactically and did not observe any subsequent reduction in rodent activity despite the Products working as advertised to repel rodents." (*Id*. at 7.) Defendant additionally argues that "Heumann's allegations suffer from the same lack of specificity" as he "does not allege that he ever observed any specific rodent activity nor that he used Woodstream products and did not see a reduction in the amount of rodent activity observed" but rather alleges "that he used the Products and still noticed rodent-caused damage to his property." (*Id*.) Defendant contends that the "mere fact that after using the Products, Heumann observed rodents does not mean that there was not a *reduction* of rodent activity as represented." (*Id*.) However, drawing all inferences in favor of Plaintiffs, which this Court must do at the motion to dismiss phase, Maroney's allegations that he "used the Repellers for several months but observed no reduction in rodent activity" and Heumann's allegations that after using the products for months, he still "found his property damaged by rodents" suffices at this stage to plausibly allege that Plaintiffs used the Repellers for more than 6 to 10 days and did not see a meaningful reduction in rodent activity. (SAC ¶¶ 7, 9.)

products or representations," including the definition of "repellency" as a reduction in rodent activity, particularly over 6 to 10 days, and Repellers' emission of "ultrasound at varying volumes (peaking at 100dB) and varying frequencies (ranging from 32 to 62 kHz)."  (Def.'s Mem 8; Def.'s Reply 2.)  However, the articles Plaintiffs cite to, for instance, the articles *Frightening Methods and Devices/Stimuli to Prevent Mammal Damage* and *Sonic Pest Repellents*, stand for the basic proposition that the underlying methodology used by the Repellers is ineffective and does not repel rodents.  (SAC ¶¶ 20–28.)  Therefore, the fact that the cited articles do not test the Repellers products or specific representations or were conducted before the Repellers were created is not dispositive here, as Plaintiffs have plausibly alleged the *method* utilized by the Repellers is ineffective.  *See Quinn v. Walgreen Co.,* 958 F. Supp. 2d 533, 543–44 (S.D.N.Y. 2013) ("To support their claims, plaintiffs cite to numerous scientific studies that arguably support their conclusion that glucosamine and chondroitin products cannot reverse the deterioration of cartilage or cause it to be rebuilt.  Therefore, plaintiffs have plausibly alleged that defendant's claim that the Glucosamine Supplements 'help rebuild cartilage' is false or deceptive."); *see also Pearson v. Target Corp.*, No. 11-CV-7972, 2012 WL 7761986, at *2 (N.D. Ill. Nov. 9, 2012) ("[W]hether or not the proffered studies are applicable to [the supplement at issue] is a question of fact that I do not decide at this stage.  The fact that these studies looked at products that shared the same active ingredients . . . makes Plaintiff's claim facially plausible.").  Indeed, Plaintiffs are "not obligated in [their] complaint to definitively prove all of [their] claims by reference to unassailable scientific fact.  Rather, [they are] only required to state a claim that is plausible on its face."  *Tomasino v. Estee Lauder Companies, Inc.*, No. 13-CV-4692, 2015 WL 1470177, at *5 (E.D.N.Y. Mar. 31, 2015) (allowing GBL claim to go forward when the plaintiff

18

cited studies "that arguably support the[ ] conclusion" that ANR products cannot repair damaged DNA).[2]

### 2. Fraud

"Under New York law, the five elements of fraud are (1) a material misrepresentation or omission of fact (2) made by [a] defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021) (quotation marks omitted); *see also Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 784 (2d Cir. 2003) ("To succeed on a theory of fraudulent misrepresentation under New York law, a plaintiff must show that the defendant made a false representation of a material fact to the plaintiff and that the plaintiff suffered injury as a result of justifiable reliance upon that fact."). Fraudulent intent may be inferred either "(a) by alleging facts to show that defendant[] had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Duchimaza v. Niagara Bottling, LLC,* 619 F. Supp. 3d 395, 416 (S.D.N.Y. 2022) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006)).

---

[2] Plaintiffs present facts in their Second Amended Complaint supporting the contention that even if rodents were affected by ultrasound, the Repellers would still not work in a real world setting because "[u]ltrasonic sound waves are highly directional, and are unable to penetrate or bend around solid objects such as cabinets, doors, furniture, appliances, walls, floors or ceilings." (SAC ¶¶ 30–32.)  Defendant claims that this argument is unavailable to Plaintiffs because the Repellers "disclose that the ultrasound will not travel through those objects."  (Def.'s Mem. 10.)   As the Court has already determined that Plaintiffs have plausibly alleged that the ultrasound technology utilized by the Repellers is ineffective, it need not consider this alternate line of argument—namely, whether the Repellers' representations were materially misleading even if the technology underlying the Repellers was indeed effective.

Defendant argues that "[t]he SAC is devoid of facts that give rise to any inference of fraudulent intent, much less a strong inference as required." (Def.'s Mem. 13.)  Plaintiffs argue that the alleged facts support a strong inference of fraudulent intent because "every legitimate study to ever examine ultrasonic technology has found it to be ineffective" and "[r]ecognizing the weight of the scientific evidence against the efficacy of electronic pest control devices, the FTC has issued multiple letters to, and even instituted several actions against, manufacturers and retailers of these devices." (Pl.'s Mem. 15.)  Indeed, Plaintiffs allege that the "false and misleading representations and omissions were made with knowledge of their falsehood" because "Defendant is a top distributor of pest repellant products in the United States that is undoubtedly aware of the studies finding that its product does not work and of the FTC investigation." (SAC ¶ 74.)  While the Court agrees with the Parties that "the FTC may not have specifically challenged the claims made by Defendant," because the FTC challenges, as alleged in Plaintiffs' Second Amended Complaint, centered on representations that ultrasonic devices can *eliminate* rodent infestations and serve as effective alternatives to conventional pest-control products, the Court agrees with Plaintiffs that the FTC warning letters and actions could plausibly provide notice that ultrasonic repellers were generally ineffective. (Pl.'s Mem. 13; Def.'s Reply 6.)

Accordingly, this case is not one where Plaintiffs merely alleges that "a large company such as the defendant would have learned, as part of its ordinary course of business that its labels were misleading," as Defendant argues. (Def.'s Mem. 14 (citing *Quiroz v. Beaverton Foods, Inc.*, No. 17-CV-7348, 2019 WL 1473088, at *10 (E.D.N.Y. Mar. 31, 2019) (holding that plaintiff's allegations "that [d]efendant had a motive to misrepresent whether the Product contained preservatives in order to gain a marketing advantage over competitors that do not

engage in such deceptive conduct and (2) that Defendant knew that its No Preservatives label was false because [u]pon information and belief, Defendant employs food scientists who are familiar with the basic properties of citric acid and [t]hus, Defendant knew that citric acid was a preservative" was insufficient to show fraudulent intent) (quotation marks and citation omitted).) Nor have Plaintiffs "plead scienter by simply alleging in a conclusory fashion that a manufacturer-defendant knew that a statement on its product's label was not accurate." *Turk v. Rubbermaid Inc.,* No. 21-CV-270, 2022 WL 836894, at *13 (S.D.N.Y. Mar. 21, 2022) (holding allegation that "Defendant's fraudulent intent is evinced by its knowledge that the Products' abilities were not consistent with its representations" was insufficient).  Instead, the Court finds that Plaintiffs have sufficiently alleged fraudulent intent by plausibly alleging the Defendant's awareness of falsity—through knowledge of "an alleged lack of supporting scientific evidence for [Defendant's] claims," scientific studies disputing Defendant's representations, and FTC challenges in cases involving similar allegations of fraudulent misrepresentations.  *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 473 (E.D.N.Y. 2013) (holding that fraudulent intent was sufficiently alleged where a complaint pointed to scientific evidence that, despite its advertising to the contrary, defendant's product did not provide support for one's immune system and FTC investigations into representations by its competitors that their similar products boosted immune systems); *see also Hart v. BHH, LLC*, 323 F. Supp. 3d 560, 565 (S.D.N.Y. 2018) (denying summary judgement when "the FTC letters and numerous studies cited by Plaintiffs demonstrate that [defendant] may have been on notice that ultrasonic repellers were generally ineffective," and noting that questions of intent are "notoriously inappropriate" for summary judgment); *Rodriguez v. Hanesbrands Inc.,* No. 17-CV-1612, 2018 WL 2078116, at *7 (E.D.N.Y. Feb. 20, 2018), *report and recommendation adopted,* No. 17-CV-1612, 2018 WL

1686105 (E.D.N.Y. Mar. 30, 2018) ("In consumer fraud cases in which scienter was found to be adequately pled, the pleadings alleged specific facts suggesting the defendants' knowledge of the falsity of their representations.").  Accordingly, the claim survives.

### 3.  Breach of Warranty Claims

"An express warranty is an 'affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain.'"  *Barreto v. Westbrae Nat., Inc.,* 518 F. Supp. 3d 795, 806 (S.D.N.Y. 2021) (quoting N.Y. U.C.C. § 2–313(1)(a)).  To adequately state a claim for breach of an express warranty under New York law, plaintiffs must plead "(1) the existence of a material statement amounting to a warranty, (2) the buyer's reliance on this warranty as a basis for the contract with the immediate seller, (3) breach of the warranty, and (4) injury to the buyer caused by this breach."  *Wynn v. Topco Assocs., LLC*, No. 19-CV-11104, 2021 WL 168541, at *7 (S.D.N.Y. Jan. 19, 2021) (quoting *Goldemberg v. Johnson & Johnson Consumer Cos., Inc*., 8 F. Supp. 3d 467, 482 (S.D.N.Y. 2014)).

To assert a breach of warranty claim under New York law—and, by extension, under the MMWA—"the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."  *Tomasino v. Estee Lauder Cos. Inc*., 44 F. Supp. 3d 251, 260 (E.D.N.Y. 2014) (quoting N.Y. U.C.C. § 2–607(3)(a)); *see also In re Gen. Motors LLC Ignition Switch Litig*., No. 14-MC-2543, 2016 WL 3920353, at *18 (S.D.N.Y. July 15, 2016) (holding that a claim under the MMWA is derivative of, and dependent on, a state-law express warranty claim).  To satisfy this notice requirement, a plaintiff must "alert [the] defendant that the transaction was troublesome," but need not "include a claim for damages or threat of future litigation."  *Grossman v. Simply Nourish Pet Food Co.*, 516 F. Supp. 3d 261, 282 (E.D.N.Y. Jan. 27, 2021) (alterations, quotation marks, and citation omitted).  Although

"[t]he sufficiency and timeliness of the notice is generally a question for the jury," *Tomasino*, 44 F. Supp. 3d at 260 (citation omitted), to adequately plead the pre-suit notice requirement, "plaintiff[s] must provide factual allegations—such as the date and method plaintiff[s] sent a pre-suit notice—supporting the contention that [they] notified [the] defendant of the alleged breach within a reasonable time," *Grossman*, 516 F. Supp. 3d at 283.  Moreover, what constitutes a "reasonable time" for taking an action "depends on the nature, purpose and[,] circumstances of such action."  *Tomasino*, 44 F. Supp. 3d at 260 (citing N.Y. U.C.C. § 1–204(2)).  Where "only one inference may be drawn as to the reasonableness of the time  . . ., it becomes a question of law" that can be resolved on a motion to dismiss.  *Telit Wireless Sols., Inc. v. Axesstel, Inc.*, No. 15-CV-5278, 2016 WL 1587246, at *6 (S.D.N.Y. Apr. 18, 2016) (citing cases); *see also Petrosino v. Stearn's Prod., Inc.*, No. 16-CV-7735, 2018 WL 1614349, at *8 (S.D.N.Y. Mar. 30, 2018) (granting a motion to dismiss for lack of timely notice); *Tyman v. Pfizer, Inc.*, No. 16-CV-06941, 2017 WL 6988936, at *22–23 (S.D.N.Y. Dec. 27, 2017) (report and recommendation) (same), *adopted by* 2018 WL 481890 (S.D.N.Y. Jan. 18, 2018); *Tomasino*, 44 F. Supp. 3d at 260–62 (same).[3]

---

[3] Plaintiffs have argued that "New York courts have acknowledged an exception to the notice requirement for retail purchasers."  (Pls.' Mem. 16.)  While Plaintiffs are correct that there is a "line of New York cases suggesting that the notice requirement does not apply to retail sales," *Neri v. R.J. Reynolds Tobacco Co.*, No. 98-CV-371, 2000 WL 33911224, at *19 (N.D.N.Y. Sept. 28, 2000) (citing *Fischer v. Mead Johnson Labs.*, 341 N.Y.S.2d 257, 259 (App. Div. 1973)), numerous courts in the Second Circuit have explained that "this exception appears to be exclusively applied where the party alleges physical, in addition to economic, injury," *Colella v. Atkins Nutritionals, Inc.*, 348 F. Supp. 3d 120, 143–44 (E.D.N.Y. 2018) (collecting cases); *see also Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 589–90 (S.D.N.Y. 2021) (explaining that "[b]ecause [the] [p]laintiff only alleges economic injury in the form [of] a price premium paid for the [p]roduct, this exception—to the extent it exists at all—is inapplicable," and dismissing breach of express warranty claim for failure to allege pre-suit notice).

Defendant argues that Plaintiffs fail to sufficiently allege timeliness.  (Def.'s Mem. 17–20.)  Plaintiffs allege that Maroney used the Repellers for several months but observed no reduction in rodent activity and provided notice to Defendant that the Repellers were defective approximately 11 months after purchase.  (SAC ¶ 7.)  Defendant argues this delay was unreasonable, pointing to a series of federal and state cases, none of which, however, is controlling here.  (Def.'s Mem. 17–18 (citing *Tomasino*, 44 F. Supp. 3d at 261–62; *Tyman*, 2017 WL 6988936, at \*2223; *In re First Hartford Corp.*, 63 B.R. 479, 487 (S.D.N.Y. 1986); *Mount Vernon Mills, Inc. v. Murphy Textile Mills*, 539 N.Y.S.2d 334, 334 (App. Div. 1989).)  In *Tomasino*, the court held that a delay of two to three years was unreasonable for face creams when plaintiff did not "posit any reason why the products' alleged shortcomings would not have been readily discoverable so that she could have provided notice of the alleged breach of warranty without delay," and assuming the plaintiff did not use the products for six months after purchase and that it took a full year to discover the alleged shortcomings, "there would still be another year during which she would have failed to notify the defendants of the alleged breach." 44 F. Supp. 3d at 260–62.  Such a delay is incomparable to the approximately eleven-month delay between purchase and notice in this case.  Next, in *Tyman,* the court held that the plaintiffs could not bring express warranty claims because they failed to allege both when they purchased the products or when they discovered or should have discovered the alleged breach—issues that are not dispositive as to Maroney, who has alleged, at the very least, a purchase date. *Tyman,* 2017 WL 6988936, at \*23.

Defendant also points to *Mount Vernon Mills, Inc. v. Murphy Textile Mills,* 539 N.Y.S.2d 334, 335 (App. Div. 1989) where the court held that a seven-month delay in notification from the date of delivery was unreasonable for a claim that goods were delivered late.  (Def.'s Mem. 17.)

24

However, the late delivery of an item is clearly detectable immediately upon delivery, unlike the effectiveness of the Repeller, which is more difficult to detect. *In re First Hartford Corp,* where the court held that a five-month delay in notification was unreasonable, is similarly inapposite because the delivered wool, inspected within 10 days of arrival, was immediately found unsatisfactory because of "an excessive amount of skin." 63 B.R. at 484. And importantly, in both *Mount Vernon Mills, Inc.* and *In re First Hartford Corp* the parties claiming breach of warranty were merchants as opposed to retail consumers. The commentary that accompanies § 2–607(3)(a) provides that:

> The time of notification is to be determined by applying commercial standards to a merchant buyer. 'A reasonable time' for *notification from a retail consumer* is to be judged by different standards so that in his case it will be extended, for the rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy.

*Tomasino v. Estee Lauder Companies, Inc.,* No. 13-CV-4692, 2015 WL 4715017, at *3 (E.D.N.Y. Aug. 7, 2015) (citing N.Y. U.C.C. § 2-607 cmt. 4). "As one scholar has observed: 'Comment 4 reflects the view that the consumer quite often will take longer to appreciate the nature of a breach and to realize the seller may be liable for it.'" *Id.* (citing Harry G. Prince, *Overprotecting the Consumer? Section 2–607(3)(a) Notice of Breach in Nonprivity Contexts,* 66 N.C. L. Rev. 107, 126–27 (1987)); s*ee also Levin v. Gallery 63 Antiques Corp.,* No. 04-CV-1504, 2006 WL 2802008, at *19 (S.D.N.Y. Sept. 28, 2006) ("A 'reasonable time' for notification from a retail consumer 'is to be judged by different,' more lenient, standards than those applied to merchant or commercial buyers.").

This Court cannot definitively determine at this stage how long it should reasonably take a person to discover that a product advertised for reducing rodent activity is ineffective. Maroney allegedly "used the Repellers for several months but observed no reduction in rodent

activity"—indeed, it may have taken months to ascertain definitively whether the rodent activity had been reduced.  (SAC ¶ 7.)  *Cf. Archstone v. Tocci Bldg. Corp. of New Jersey, Inc.,* 959 N.Y.S.2d 497, 499 (App. Div. 2012) (holding that notice of alleged breach of warranty and intent to assert legal rights regarding allegedly defective wall panels used for construction project provided more than two years after final delivery, and after installation, unreasonable as a matter of law because "[q]ualities that are apparent, such as size and color, reasonably should be inspected and complained of soon after the goods . . . have been delivered" under Massachusetts U.C.C. which similarly requires that "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy"). Accordingly, the Court is not prepared to hold that Plaintiffs should have discovered that the Repellers were ineffective in less than a few months.  *See Patellos v. Hello Prod., LLC*, 523 F. Supp. 3d 523, 533 (S.D.N.Y. 2021) (holding that the "SAC adequately pleads that notice seven months after purchase was reasonably timely, insofar as the defect that [plaintiff] claims was one that, by its nature, became apparent not immediately but over time" and that a second plaintiff's ten month notice sufficed "because the timeliness of notice *is generally* a question of fact for the jury, [thus] the Court will not dismiss Fishon's claim on this ground" (emphasis added) (citation omitted)); *Levin v. Gallery 63 Antiques Corp.,* No. 04-CV-1504, 2006 WL 2802008, at *19 (S.D.N.Y. Sept. 28, 2006) (holding that timeliness was a "question better resolved by a jury").[4]

---

[4] The Court acknowledges that it does appear from Plaintiffs' pleading that there was likely a period of months where Maroney was aware that he had observed no reduction in rodent activity but did not give notice until he learned that the lack of reduction was due to a defect in the product, in August 2019.  (SAC ¶ 7.)  However, as many cases dismissing retail consumers' breach of warranty claims on timeliness grounds do so after significantly more time has elapsed, this Court declines to dismiss on timeliness grounds.  *See, e.g.*, *Bassaw v. United Indus. Corp*., 482 F. Supp. 3d 80, 87 (S.D.N.Y. 2020) ("[I]t appears that Bassaw waited nearly three full years to provide notice to Defendants, which is plainly unreasonable as a matter of law."); *Tomasino*, 44 F. Supp. 3d at 260–62 (holding that a delay of two to three years was unreasonable when,

Defendant additionally argues that the "'demand letter' Maroney sent to Woodstream did not provide sufficient notice" because it failed to "specify which particular product Maroney purchased, when he purchased the product, or, critically, when he used the product."  (Def.'s Mem. 18.)  However, Defendant cites to no case supporting the assertion that the *notice* to a defendant must itself specify when a product was purchased or used.  (*See generally* Def.'s Mem.)  Indeed, the "notice required to preserve [the] right to sue for damages need only 'alert [the prospective defendant] that the transaction [was] troublesome.'"  *Tomasino*, 44 F. Supp. 3d at 260 (alteration in original).  Defendant's argument that Maroney's letter did not "identify [the] particular PestChaser product," (Def.'s Mem. 18), is not persuasive here—the letter specifically referenced Victor PestChaser Rodent Repellers, which Plaintiffs allege all fail because the ultrasound technology they utilize an effective, (*see generally* SAC).

Heumann's timeliness allegations, while a bit more convoluted, suffice for the same reason.  Plaintiffs allege that between October 18, 2017, when Heumann first mailed Repellers to Defendant claiming they were ineffective, and May 9, 2018, when he again informed Defendant the Repellers were ineffective, Heumann purchased additional Repellers "based on Defendant's assurances [in the intervening time] that the Repellers were effective."  (SAC ¶ 9; SAC Ex. A.)  At most, six to seven months could have elapsed between Heumann's purchasing the Repellers and his 2018 notice, less than elapsed for Maroney.  Detecting rodent damage on one's property, as Heumann eventually did "months later"—namely months after Heumann purchased additional Repellers based on Defendant's assurances, may take time.  (SAC ¶ 9.)  For reasons the Court has already explained, it is not prepared to hold that Heumann should have discovered that the

---

assuming the plaintiff did not use the products for six months after purchase and that it took a full year to discover the alleged shortcomings, "there would still be another year during which she would have failed to notify the defendants of the alleged breach").

Repellers were allegedly ineffective before he notified Defendants in May 2018. (*Id.*) However, Plaintiffs do not identify when Heumann bought any of the Repellers he claims to have purchased before October 2017 or when he discovered they were defective—Plaintiffs only allege that he been purchasing them for "several years." (*Id*. ¶¶ 8–9, *id* at Ex. A.) This lack of specificity is fatal to any warranty claim stemming from Repellers Heumann purchased before October 2017. *See Tyman*, 2017 WL 6988936, at *23 (dismissing warranty claim when "plaintiffs are silent as to when they purchased the [] Products. They are equally silent as to when they discovered or should have discovered the alleged breach of warranty").

### 4.  Unjust Enrichment and Injunctive Relief

Defendant argues that Plaintiffs have abandoned their unjust enrichment and injunctive relief claims. (Def.'s Mem. 15, 20.) Indeed, Plaintiffs do not respond to Defendant's arguments regarding their unjust enrichment and injunctive relief claims in their Opposition. (*See generally* Pl.'s Mem.) "In the Second Circuit, a plaintiff's failure to respond to contentions raised in a motion to dismiss constitute[s] an abandonment of those claims" and necessitates their dismissal. *Gordon v. Target Corp.*, No. 20-CV-9589, 2022 WL 836773, at *17 (S.D.N.Y. Mar. 18, 2022). Accordingly, Plaintiffs have abandoned their unjust enrichment and injunctive relief claims. *See Laface v. E. Suffolk BOCES*, No. 18-CV-1314, 2019 WL 1959489, at *8 (E.D.N.Y. May 2, 2019) ("[A] plaintiff's failure to respond to contentions raised in a motion to dismiss constitute[s] an abandonment of those claims." (alteration omitted) (collecting cases)); *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage . . . a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim.").

### III.  Conclusion

For the foregoing reasons, Defendant's Motion is denied in part and granted in part.
Defendant's Motion is granted with regard to Plaintiffs' breach of warranty claims for Heumann
that predate October 2017 and Plaintiffs' unjust enrichment and injunctive relief claims.
Defendant's Motion is denied with regard to Plaintiffs' remaining breach of warranty claims and
their GBL and fraud claims.  Because this is the first adjudication of Plaintiffs' claims on the
merits, Plaintiffs' breach of warranty claims for Heumann that predate October 2017 are
dismissed without prejudice. [5]  If Plaintiffs wish to file a third amended complaint alleging
additional facts and otherwise addressing the deficiencies identified above, Plaintiffs must do so
within 30 days of the date of this Opinion & Order.  Plaintiffs are further advised that the third
amended complaint will completely replace, not supplement, the instant Second Amended
Complaint.  The third amended complaint must therefore contain all of the claims, defendants,
and factual allegations that Plaintiffs wish the Court to consider.  If Plaintiffs fail to timely file a
fourth amended complaint, the dismissed claim may be dismissed with prejudice.

The Court will hold a status conference on October 10, 2023 at 11:30 A.M.  The Clerk of
the Court is respectfully requested to terminate the pending motion.

---

[5] Plaintiffs' unjust enrichment and injunctive relief claims are dismissed with prejudice as
they were abandoned.  *See Jennings v. Hunt Companies, Inc*., 367 F. Supp. 3d 66, 70 (S.D.N.Y.
2019) ("[T]he [c]ourt considers these claims abandoned and dismisses them with prejudice.");
*Verdi v. City of New York*, 306 F. Supp. 3d 532, 552 (S.D.N.Y. 2018) ("Plaintiff did not respond
to their arguments in his opposition; accordingly, Plaintiff abandoned his negligence claims, and
they are dismissed with prejudice.").

SO ORDERED.

Dated:    September 28, 2023
             White Plains, New York

_____
KENNETH M. KARAS
United States District Judge